Opinión disidente emitida por el
Juez Asociado Señor Rivera Pérez.
Muy respetuosamente DISENTIMOS de la decisión de la Mayoría de no expedir el recurso de epígrafe. No comparti-mos el criterio de la Mayoría de no intervenir con lo resuelto por el foro intermedio apelativo, en cuanto a la suficiencia de la prueba presentada ante el Tribunal de Primera Ins-tancia para sostener la existencia de malicia real en la pu-blicación de la información alegadamente difamatoria. De-bido a que dicha determinación no es congruente con la prueba desfilada en el foro primario y tampoco se ajusta a la pauta vigente sobre el tema, consideramos pertinente ex-presamos por separado para plasmar nuestro criterio.
El presente recurso pone de manifiesto los esfuerzos rea-lizados por este Tribunal para definir y conciliar apropiada-mente la doctrina de difamación con las libertades de prensa y expresión, protegidas constitucionalmente. Me-diante esta opinión haremos, una vez más, el esfuerzo de proponer la formulación de un criterio categórico y uniforme que aplique a todos los casos de difamación de figuras públicas. El norte de nuestras decisiones debe ser la estabi-lidad en la consecución de la verdad, la seguridad jurídica, la justicia y la igualdad.
La controversia principal del caso de autos es de eviden-cia, a saber, si desfiló ante el tribunal sentenciador prueba clara y convincente de la cual razonablemente se pudiera *733 inferir la existencia de malicia real en la publicación. Espe-cíficamente debemos determinar si el señor Krans y sus hi-jos presentaron prueba suficiente que permitiera concluir al juzgador de hechos que los peticionarios abrigaban serias dudas sobre la certeza y veracidad de la información publicada. Veamos los hechos acaecidos que originan el pre-sente recurso.(1)
I
Para el 2001, el Sr. Adolfo Krans Bell(2) (señor Krans) era el esposo de la entonces Gobernadora de Puerto Rico, la Honorable Sila María Calderón (Gobernadora). Éste participó activamente en las campañas electorales de 1996 y 2000, en las cuales la Gobernadora aspiró a la posición de Alcaldesa de San Juan y de Gobernadora de Puerto Rico, respectivamente. El señor Krans se afianzó como figura pública.(3) Según las determinaciones de hechos del Tribunal de Primera Instancia, luego del juramento y de la toma de posesión de su esposa como Gobernadora de Puerto Rico en el 2001, la relación matrimonial entre ambos comenzó a deteriorarse.(4)
*734 Por su parte, según indican las determinaciones de he-chos del foro primario, el Sr. Antulio Santarrosa (señor San-tarrosa) es el productor del programa SuperXclusivo, trans-mitido por Televicentro de Puerto Rico, Inc. (Televicentro y, en conjunto, peticionarios). En el programa, el señor Santa-rrosa, a través de su personaje La Comay, divulga informa-ción sobre las figuras públicas del país.(5)
Surge de la prueba creída por el foro primario que el 3 de agosto de 2001, antes de que saliera al aire el programa SuperXclusivo, la Gobernadora le comunicó telefónicamente al señor Krans su deseo de divorciarse y le indicó que envió un comunicado de prensa para hacer pública la noticia de su separación. Luego de conocer la intención de la Goberna-dora, el señor Krans se comunicó con sus hijos, el señor Kendall, la señora Karusha y la señora Gretchen, todos de ape-llido Krans Negrón (hijos), para notificarles su separación matrimonial.(6)
Tal y como lo recoge las determinaciones de hechos del Tribunal de Primera Instancias, avaladas por el foro apela-tivo intermedio, ese mismo día —es decir, el 3 de agosto de 2001— el señor Krans y tres de sus hijos se reunieron en su oficina para observar el programa SuperXclusivo en el cual el señor Santarrosa, mediante su personaje La Comay, leyó el comunicado de prensa que emitió la Gobernadora publi-cando su separación matrimonial. Es en dicho programa que el señor Santarrosa, a través del personaje La Comay, manifestó que el señor Krans presuntamente sostenía una relación extramarital con una mujer a quien le compró un apartamento, unas joyas y un vehículo de motor.(7) Es im- *735 portante subrayar que el foro primario no expresó, ni en sus determinaciones de hechos ni en parte alguna de su dicta-men, la razón o el motivo de por qué el señor Krans convocó a sus hijos a una reunión para observar el programa Super-Xclusivo inmediatamente después de conocer la intención de su entonces esposa, la Gobernadora de Puerto Rico, de disolver el vínculo matrimonial entre éstos.
El 6 de agosto de 2001 uno de los hijos del señor Krans(8) envió una comunicación escrita al Sr. Joe Ramos, gerente de Televicentro. Según las determinaciones de hechos del foro primario, mediante la referida carta éste le expresó la pre-ocupación de su familia debido a la falsedad de la informa-ción difundida en el programa SuperXclusivo. A su vez, so-licitó a Televicentro que, a través del programa SuperXclusivo, se retractara de lo dicho.(9)
Los peticionarios, según sostienen las determinaciones de hechos del foro primario, no se retractaron de las impu-taciones realizadas contra el señor Krans. Por el contrario, en el programa SuperXclusivo del 7 de agosto de 2001 el señor Santarrosa, a través de su personaje La Comay, mos-tró a través de la televisión una cinta de video en la cual, supuestamente y según sus expresiones, se evidenciaba la relación extramarital imputada. El contenido de dicha cinta nunca se presentó en el programad.(10) Posteriormente, la Go-bernadora instó una demanda de divorcio contra el señor Krans, y el 6 de noviembre de 2001 se dictó una Sentencia que decretó roto y disuelto el matrimonio entre éste y la Gobernadora.
El 2 de agosto de 2002 el señor Krans y sus hijos presen-taron ante el Tribunal de Primera Instancia, Sala Superior de Bayamón, una demanda contra el señor Santarrosa y *736 Televicentro.(11) Mediante ésta alegaron, entre otras cosas, que las expresiones vertidas por el señor Santarrosa en el programa SuperXclusivo, a través de su personaje La Co-may, eran totalmente falsas, insultantes y con claro y mali-cioso menosprecio a la verdad. Adujeron que fueron difundi-das con el único propósito de difamar el honor, la dignidad, el buen nombre y la reputación, personal y profesional del señor Krans, a sabiendas de que lo expresado carecía de veracidad. Asimismo, señalaron que Televicentro era res-ponsable solidariamente por los actos del señor Santarrosa, ya que como operador y dueño del canal no corroboró la veracidad y confiabilidad de la información difundida.(12)
Finalmente, el señor Krans y sus hijos aseveraron en la demanda que, a pesar de que se notificó a los peticionarios mediante una misiva la falsedad de la imputación, el señor Santarrosa no la corrigió posteriormente, sino que éste sos-tuvo en una segunda transmisión del programa SuperXclu-sivo que tenía en su poder un video que supuestamente las corroboraba. Por esto solicitaron que se le compensara por los daños morales, los sufrimientos y las angustias menta-les, así como las pérdidas económicas de sus empresas co-merciales sufridas como consecuencia de la difusión de dicha información.(13)
Luego de varios incidentes procesales, el Tribunal de Pri- *737 mera Instancia celebró un juicio.(14) Durante éste se pre-sentó como evidencia las videograbaciones de los programas de SuperXclusivo, en las cuales constaban las expresiones del señor Santarrosa.(15) Con el propósito de establecer la malicia real en la difusión de la información, se presentó además el testimonio de la Sra. Carmen Jovet Esteves (se-ñora Jovet) y, mediante deposición, el del Sr. Leopoldo Fer-nández III (señor Fernández).(16) Estos declararon, entre otras cosas, que el video que alegadamente corroboraba la relación extramarital que el señor Santarrosa imputó al se-ñor Krans nunca existió. El foro primario corroboró dichos testimonios con la videograbación del programa de la señora Jovet, en el cual ésta entrevistó al señor Fernández sobre el particular.
En consecuencia, el Tribunal de Primera Instancia dictó una Sentencia mediante la cual declaró “con lugar” la demanda. Determinó que los peticionarios publicaron la in-formación con malicia real, en su modalidad de grave me-nosprecio a la verdad, razón por la que impuso responsabi-lidad solidaria al señor Santarrosa y a Televicentro, determinando que los daños y perjuicios sufridos por el se-ñor Krans y sus hijos ascendían a la suma de $260,000.(17) *738 Resolvió, no obstante, que la evidencia presentada por el señor Krans y sus hijos no fue suficiente para probar que la información difamatoria vertida en el programa SuperXclu-sivo era la causa próxima de la merma en sus negocios.
Inconformes con el referido dictamen, los peticionarios acudieron ante el Tribunal de Apelaciones mediante sendos recursos de apelación.(18) Mediante la Sentencia emitida el 12 de marzo de 2007, el foro apelativo intermedio confirmó la Sentencia apelada en todos sus extremos.(19)
Insatisfechos con dicho dictamen, los peticionarios acu-den ante nos mediante sus respectivos recursos de certiorari. En su recurso,(20) el señor Santarrosa le imputó al foro apelativo intermedio la comisión de los errores siguien-tes:
1. ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIR-MAR Y CONCLUIR QUE MEDIÓ MALICIA.

2. ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIR-MAR UNA COMPENSACIÓN POR ANGUSTIAS MENTA-LES DE CARÁCTER PUNITIVO.

3. ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIR-MAR QUE LOS DEMANDADOS PROCEDIERON CON TE-MERIDAD
4. ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIR-MAR QUE LA PARTE DEMANDANTE NO FUE TEMERARIA.
Telvicentro, por su parte, imputó en su recurso de *739 certiorari(21)al foro apelativo intermedio la comisión de los errores siguientes:

ERRARON LOS TRIBUNALES DE INSTANCIA Y APELA-CIONES, REGIÓN JUDICIAL DE BAYAMÓN, AL DESEN-TENDERSE DEL ESTADO DE DERECHO APLICABLE, EN BENEFICIO DE NOCIONES AJENAS A LA NORMATIVA DE EVALUACIÓN DE LOS DAÑOS EMOCIONALES QUE ESTABLECE TANTO LA JURISPRUDENCIA DE ESTE TRIBUNAL COMO EL TRIBUNAL SUPREMO DE LOS ES-TADOS UNIDOS).]

ERRARON LOS TRIBUNALES DE INSTANCIA Y APELA-CIONES, REGIÓN JUDICIAL DE BAYAMÓN, AL IGNORAR ABIERTAMENTE EL ESTADO DE DERECHO VIGENTE EN TORNO A LA IMPOSICIÓN DEL PAGO DE HONORA-RIOS DE ABOGADO EN UNA SITUACIÓN EN QUE NO MEDIÓ TEMERIDAD DE PARTE DE TELEVICENTRO).]

II
La libertad de prensa es un derecho fundamental consa-grado en el Art. II, Sec. 4 de la Constitución de Puerto Rico, cláusula constitucional que garantiza que no se aprobará ley alguna que restrinja la libertad de palabra o de prensa, y la reparación de agravios por violación a tales derechos.(22) Esta disposición constitucional tiene su contraparte y mo-delo en la Primera Enmienda de la Constitución de Estados Unidos.(23) Su propósito es el pluralismo económico y social dentro de un sistema liberal cimentado en la diseminación de ideas y el derecho del pueblo a estar debidamente informado. Por lo tanto, la libertad de prensa es una condi-ción necesaria para la libertad de expresión. En el desarro-llo de una sociedad democrática, ambas caminan de la *740 mano.(24) Sin el conocimiento de los hechos no se puede juzgar.(25)
La libertad de prensa tiene por finalidad servir como sus-tituto de la presencia directa del pueblo, por ser derecho de este último el estar debidamente informado de lo que acon-tece en su gobierno y en la gestión de los funcionarios públicos.(26) Además, permite fomentar el debate vigoroso, precisamente en pro de ese derecho del individuo a estar informado.(27) Esto es imprescindible para la vivencia de nuestra democracia participativa.(28)
Consecuentemente, es ineludible que esta garantía cons-titucional cobije tanto la manifestación veraz como la inco-rrecta,(29) el ataque vehemente cáustico (hostil) y muchas veces desagradablemente punzante al Gobierno, sus funcio-narios y otras figuras públicas.(30) Las garantías conferidas por la libertad de prensa deben aplicarse no solamente a aquellos que se pueden clasificar por los tribunales como “prensa”, sino a quienquiera y a cualquier medio que regu-larmente asuma la misión de la prensa.(31) Es dentro de este contexto de las publicaciones de prensa que se manifiesta la difamación.
*741 III
En la esfera civil, la difamación se define como desacre-ditar a una persona, publicando información falsa contra su prestigio, fama y reputación.(32) Abarca los conceptos de li-belo(33) y calumnia,(34) definidos estatutariamente por la Ley de Libelo y Calumnia de Puerto Rico(35) —codificada en el Código de Enjuiciamiento Civil— los cuales crean una causa de acción torticera, probados cualquiera de éstos.(36) No obs-tante, hemos resuelto que es la Constitución de Puerto Rico y la Primera Enmienda de la Constitución de Estados Uni-dos —y no la Ley de Libelo y Calumnia de Puerto Rico— las fuentes principales de la protección contra injurias. Dicho estatuto sobrevive tan sólo en cuanto sea compatible con éstas.(37)
Es preciso señalar que las normas constitucionales fede-rales imponen las pautas y los requisitos de protección mí-nimos que deben seguirse. Ello es así, ya que Puerto Rico, como cualquier estado de la Unión Americana, tiene facul-tad para establecer sus propias normas de responsabilidad *742 por difamación, siempre y cuando no se imponga responsa-bilidad absoluta o que las reglas que se adopten no reduzcan el contenido mínimo de la Primera Enmienda de la Consti-tución federal.(38)
La publicación de información y la diseminación de ideas podrían plantear un conflicto entre dos valores de alta jerarquía. Por un lado, la libertad de expresión que protege la diseminación de ideas e información, especialmente si se trata de personas que ocupan una posición pública y, por el otro, está el derecho que tiene toda persona, como parte de su intimidad, a la protección contra ataques abusivos a su honra, su reputación, su vida privada y familiar, y a la in-violabilidad de la dignidad del ser humano.(39)
El ordenamiento jurídico constitucional vigente protege ambos intereses, por lo cual los casos de difamación requie-ren del juzgador un delicado balance de intereses.(40) El de-recho a la libre expresión no es irrestricto, sino que puede condicionarse cuando intereses públicos apremiantes lo requieran.(41) Al condicionarse tal derecho, deben conside-rarse las alternativas para alcanzar el objetivo de su limitación.(42)
Para que prospere una acción civil por libelo o difama-ción, el promovente debe probar lo siguiente: (1) la falsedad de la información publicada; (2) los daños reales sufridos a causa de dicha publicación; (3) la relación causal entre el acto negligente y los daños; (4) si el demandante es figura privada, demostrar que las expresiones fueron hechas en *743 forma negligente, y (5) si el demandante es figura pública, probar que la información fue publicada con malicia real, es decir, a sabiendas de su falsedad o con grave menosprecio de si era falsa o no.(43)
En nuestra jurisdicción rige la doctrina establecida por el Tribunal Supremo de Estados Unidos en New York Times Co. v. Sullivan, 376 U.S. 254 (1964), a los efectos de que no es difamatoria la publicación de un informe falso o de irnos comentarios injustificados concernientes a la conducta de una figura pública, a menos que la información fuera publicada maliciosamente, esto es, a sabiendas de que era falsa o con grave menosprecio a la verdad.(44)
Esta doctrina, así como el concepto de libertad de prensa garantizado por la See. 4 de nuestra Carta de Derechos, supra, y por la Primera Enmienda de la Constitución de Estados Unidos, impusieron requisitos más rigurosos que los establecidos en las disposiciones de la Ley de Libelo y Calumnia de Puerto Rico, en cuanto a la evidencia necesaria para probar la existencia de malicia real en la publicación.(45) Consecuentemente, cuando el promovente de una acción civil por difamación, ya sea por libelo (disemina-ción de información falsa por escrito) o por calumnia (dise-minación de información falsa oralmente), es una figura pú-blica, tendrá que probar específicamente que quien publicó la información falsa actúo maliciosa e intencionalmente.(46) Tienen que alegarse y probarse los hechos específicos. No es *744 suficiente afirmar meramente que la publicación fue maliciosa.(47)
Es harto conocido que el concepto “grave menosprecio a la verdad” no puede encasillarse en una definición rígida, infalible e inflexible. No obstante, ello no significa que este Tribunal, como máximo intérprete de la ley y la Constitu-ción, debe abstenerse de delimitar los contornos de este concepto.(48) Podemos y debemos establecer unos criterios uniformes y concretos para que los juzgadores puedan apli-car de manera indistinta al determinar la existencia o no de grave menosprecio a la verdad.(49) Precisamente ésta es la ineludible e impostergable labor nuestra: establecer las pau-tas mínimas en derecho que guíen a los foros judiciales en su labor adjudicativa,(50) evitando así que éstos caractericen desacertadamente la naturaleza y el contenido de la doc-trina constitucional aplicable.(51)
*745 La malicia real, siendo un elemento de intención subje-tivo, nunca se presume. Es imprescindible que el promo-vente de la acción pruebe, como mínimo, mediante evidencia clara y convincente, que el demandado tenía serias dudas sobre la certeza de la información(52) y que albergaba un serio grado de conciencia sobre su probable falsedad.(53) La suficiencia de la prueba para establecer la existencia de ma-licia real es una cuestión estrictamente de derecho,(54) La prueba de mala voluntad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de mali-cia real.(55)
El requisito de la evidencia clara y convincente es signi-ficativamente más oneroso que el standard usual de la pre-ponderancia de la prueba.(56) Estamos ante un requisito in-termedio de prueba que se encuentra entre el de mera preponderancia de la prueba en casos civiles y el de más allá de duda razonable en casos criminales.(57) Este requisito se estableció con el propósito de evitar y disuadir la autocen-sura de los medios de comunicación. (58) Dicho en otras pala- *746 bras, se trata de evitar que los medios noticiosos, por temor a ser demandados y finalmente condenados al pago de cuan-tiosas sumas, puedan verse coartados en su derecho a ex-presarse libremente. (59)
El debido proceso de ley impone que para negar un dere-cho fundamental —como la libertad de prensa, la libertad de expresión y la dignidad humana— el valor y la suficien-cia de la prueba deben medirse con criterios más rigurosos que el de preponderancia de la prueba.(60) Por tal razón, en acciones de difamación de figuras públicas es un tanto difícil probar clara y convincentemente que la diseminación de la información denigrante se publicó con serias dudas sobre su veracidad o grave menosprecio a la verdad.(61)
En fin, en controversias sobre difamación de figuras pú-blicas, como en el caso de autos, la interrogante a dirimir por el juzgador de hechos es la siguiente: ¿presentó el de-mandante o promovente evidencia suficientemente clara y convincente para sustentar que el demandado actuó con ma-licia real en la publicación? Para ello, el demandante o pro-movente puede hacer uso de evidencia directa o de evidencia indirecta o circunstancial.
IV
La Regla 10(H) de Evidencia de Puerto Rico(62) dispone que todos los casos pueden probarse mediante evidencia directa o indirecta o circunstancial.(63) Estos dos medios de *747 prueba son esencialmente iguales y ambos se evalúan con el mismo criterio.(64) Hemos resuelto que la evidencia indirecta o circunstancial es intrínsecamente igual que la evidencia directa,(65) razón por la cual todos los hechos de un litigio pueden probarse mediante evidencia indirecta o circunstan-cial, aún en los casos criminales.(66)
La evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción, y que de ser cierta demuestra el hecho de modo concluyente.(67) Por su parte, la evidencia indirecta o circunstancial es aquella que presenta una base de hechos que, mediante el uso de inferencias o presunciones, lleva razonablemente a la con-clusión sobre otros hechos.(68)
El asunto específico bajo nuestra consideración requiere que examinemos con detenimiento los preceptos aplicables a la evidencia indirecta o circunstancial. Este tipo de eviden-cia opera a base de la inferencia, deducción y presunción. Una inferencia es la deducción que en su discernimiento hace el juez o el Jurado de los hechos probados, sin que al efecto medie mandato de la ley.(69) Una presunción es una deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción;(70) es la inferencia —deducción que *748 hace en su discernimiento el juez o el Jurado— que surge de una serie de hechos probados.(71)
A pesar de que la malicia real puede probarse mediante la evidencia circunstancial,(72) no aplicará el standard general de la persona prudente y razonable, sino que aplicará el de evidencia clara y convincente.(73) El propósito es evitar que el juzgador de los hechos, al evaluar cuestiones subjeti-vas como el estado mental de la persona que publicó la in-formación supuestamente difamatoria, convierta el proceso en una pesquisa sin fin sobre la irrazonabilidad del deman-dado en investigar la información o en su cumplimiento con los estándares aceptables de su profesión.(74)
Por tal razón, el Tribunal Supremo de Estados Unidos estableció solamente tres instancias en las cuales la eviden-cia circunstancial sobre la intención subjetiva puede ser lo suficientemente poderosa para proveer prueba clara y con-vincente de malicia real. Las instancias son las siguientes: (1) cuando existe evidencia de que la historia fue fabricada o es producto de la imaginación de quien la publicó; (2) cuando existe evidencia de que el suceso es tan inherente-mente improbable que sólo una persona temeraria pudo pu-blicarlo, o (3) cuando existe evidencia de que la información publicada se basó única y exclusivamente en una fuente en *749 la cual existían razones obvias para dudar de su credibilidad.(75)
Es una norma debidamente asentada en nuestro sistema de justicia que la discreción judicial permea la evaluación de la evidencia presentada en los casos y controversias. Los jueces de instancia son quienes están en mejor posición de aquilatar la prueba, por ello su apreciación merece gran res-peto y deferencia por parte de los tribunales apelativos. En ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se intervendrá con sus conclusiones de hechos y su apre-ciación de la prueba.(76) Solamente se podrá intervenir con estas conclusiones cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba.(77)
En Méndez v. Morales, 142 D.P.R. 26 (1996), resolvimos que aunque el arbitrio del juzgador de los hechos es respe-table y merece deferencia, no es absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de este Tribunal.(78) Por consi-guiente, aunque haya evidencia que sostenga las determi-naciones de hecho del foro primario, si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error —como cuando las conclusiones es-tán en conflicto con el balance más racional, justiciero y ju- *750 rídico de la totalidad de la evidencia recibida— podrá revocarlas.(79)
Según se deduce de los precedentes señalados, la defe-rencia no es óbice para nuestra revisión judicial en un caso como el presente. Es por ello que al evaluar si la prensa se extralimitó en el ejercicio de su libertad de expresión e in-tervino con el derecho a la intimidad y dignidad humana, dentro del contexto de la difamación de figuras públicas, debemos evaluar si el demandante presentó una prueba clara y convincente para establecer los requisitos constitu-cionales de su acción.(80) En dichos casos, bajo el palio de nuestra Constitución y de la Constitución federal, estamos obligados a realizar un examen independiente de toda la evi-dencia para determinar si el dictamen apelado constituye o no una intervención indebida en el ámbito de la libertad de expresión.(81)
V
Ante el claro mandato constitucional, legislativo y juris-prudencial antes esbozado, a la luz de toda la prueba obrante en autos, incluso la trascripción del testimonio que se desprende de la deposición del señor Fernández, conclui- *751 mos que, tanto las determinaciones del foro primario como las del foro apelativo intermedio sobre la existencia de ma-licia real, no están plenamente sostenidas por la parte de-mandante mediante prueba clara y convincente. A pesar de que el señor Krans y sus hijos presentaron evidencia sobre los elementos esenciales del caso, esta prueba no puede dar base a una sentencia a su favor porque no satisface el crite-rio particular, como cuestión de hecho y de derecho, aplica-ble al caso de autos.(82)
La mera inexistencia del video, hecho sobre el cual se descansó para sostener la existencia de malicia real, no constituye base suficiente para inferir razonablemente que la información se divulgó con conocimiento de su falsedad o con grave menosprecio de si era falsa o no. La mera ocurren-cia de este incidente no necesariamente da base, de por sí, a una inferencia de malicia real.(83) Ello a pesar de que el ele-mento de intención puede probarse con evidencia circunstancial.
Contrario a lo resuelto por el foro primario y confirmado por el foro apelativo intermedio, de la deposición del señor Fernández —admitida como evidencia por estipulación en-tre todas las partes— no surge la existencia de malicia real en ninguna de sus dos modalidades. Este testificó categóri-camente en su deposición que no tenía base alguna para creer que el señor Santarrosa conocía de la falsedad de la información o que albergaba dudas sobre su veracidad.(84) Más aún, el señor Fernández admitió haber mentido cuando aseveró públicamente, en la entrevista en el programa tele-visivo de la señora Carmen Jovet, que el señor Santarrosa *752 conocía la falsedad de la imputación sobre adulterio hecha contra el señor Krans.
Los foros inferiores tampoco reconocieron valor probato-rio alguno al hecho de que el señor Fernández aceptó que todo lo que había dicho sobre el señor Santarrosa en las entrevistas que le concedió a la señora Jovet era falso, de que hizo tales manifestaciones porque se encontraba mo-lesto por la forma en que se terminó la relación profesional entre ellos y que, dentro de ese estado de ánimo, donde quiera que le dieran un foro lo aprovechaba para descar-garse contra el señor Santarrosa.(85)
De las declaraciones ofrecidas por el señor Krans no po-demos razonablemente inferir que los peticionarios tuviesen serias dudas sobre la certeza de la información publicada ni que albergaban un grado de conciencia sobre su probable falsedad. El señor Krans indicó que en la carta cursada al gerente de Televicentro el 6 de agosto de 2001, se le notificó a los peticionarios que la información divulgada en el pro-grama SuperXclusivo era falsa y que, además, les solicitó que se retractaran de lo dicho. Añade el señor Krans que éstos no se retractaron y que, por el contrario, al día si-guiente el señor Santarrosa, por medio de su personaje La Comay, mostró una cinta de video que alegadamente corro-boraba sus expresiones, pero cuyo contenido nunca se presentó.
Ninguno de estos señalamientos demuestra que para la fecha de la segunda transmisión —es decir, el 7 de agosto de 2001— el señor Santarrosa tuviese conocimiento personal de la falsedad de la información.(86) En ausencia de eviden- *753 cia adicional que sostuviera las alegaciones de la carta, es forzoso concluir que la información no se publicó con grave menosprecio sobre su veracidad.(87) Para que la negación de las imputaciones (supuestamente difamatorias) pueda sos-tener una determinación de malicia real debe existir eviden-cia adicional que, en unión a ésta, permita al juzgador infe-rir razonablemente que la información se publicó con grave menosprecio a la verdad. (88)
Cónsono con lo anterior, concluimos que la evidencia cir-cunstancial en el caso de autos no es lo suficientemente clara ni convincente para establecer la intención subjetiva de los peticionarios al momento de la publicación.
En primer lugar, no existe evidencia de que los deman-dados fabricaron el contenido de la publicación.
En segundo lugar, no existe evidencia de que el suceso es tan inherentemente improbable que solamente una persona temeraria pudo publicarlo. No obstante, aclaramos que con ello no pretendemos resolver y tampoco insinuar que las manifestaciones del señor Santarrosa tengan visos de cer-teza o veracidad. Nuestro escrutinio queda reducido a eva-luar sus expresiones sobre tal requisito o elemento deli-neado por la norma jurisprudencial aplicable como para permitir una inferencia razonable de malicia real.
Finalmente, el hecho de que la información divulgada por el señor Santarrosa en el programa SuperXclusivo proviene, *754 en algunas ocasiones, de llamadas telefónicas del público a través de líneas que se tienen disponibles para este fin,(89) no necesariamente tal situación apunta de por sí a la pre-sencia de malicia real.(90) En el caso de autos los demanda-dos no basaron totalmente la información publicada en una llamada telefónica anónima sobre la cual existieran serias dudas sobre su veracidad.(91) De la trascripción del testimo-nio de la deposición del señor Fernández se desprende que el señor Santarrosa tenía fuentes independientes —las cua-les no revelaba— que le daban información a la mano.(92)
Por las razones antes discutidas, creemos que la eviden-cia presentada no cumple con el quantum de prueba clara y convincente requerido para los casos de difamación de figu-ras públicas.
VI
Ciertamente, esta no es la primera vez que consideramos la reconciliación o el balance de derechos o intereses en ma-teria de la libertad de expresión. Nuestro criterio siempre es el resultado de un intenso esfuerzo de darle vida y sentido, y de aplicar unos preceptos constitucionales. No estamos, pues, ante una decisión o una nueva regla que permita jus- *755 tificar sólo su prospectividad. Es un contrasentido que ne-gáramos sus efectos.
Nuestro historial refleja que la tendencia seguida por este Tribunal ha sido a favor de la divulgación de la infor-mación pública, al punto de impartirle una dimensión am-plia y robusta a la libertad de expresión consagrada en nuestra Carta de Derechos.(93) No obstante, la Mayoría ig-nora dicha tendencia en este caso.
El proceso adjudicativo puertorriqueño responde en su realidad al postulado de igualdad inmerso en la Constitu-ción de Puerto Rico, el cual persigue lograr una igualdad y paridad entre todos los ciudadanos, incluyendo la prensa, para la divulgación de ideas en el país.(94)
No podemos ignorar, con un parco “no ha lugar”, la trayectoria de este Tribunal y la tendencia seguida a tra-vés de su facultad adjudicativa a favor de la divulgación de información cuando de la controversia traída ante nuestra consideración a todas luces se desprenden los mé-ritos para la aplicación de la nprma pautada. Ello propi-cia la inestabilidad, erigiéndose así un estado de derecho incoherente, huérfano de reglas uniformes necesarias que guíen la función adjudicativa de los tribunales y la con-ducta de los ciudadanos. No podemos avalar tal práctica.(95)
*756 No es la primera vez que consideramos estos asuntos. Esta preocupación invade nuestra conciencia. En P.N.P. v. Gobernadora, 162 D.P.R. 239 (2004), opinión disidente, nos expresamos a los efectos de que este Tribunal, al no pasar juicio sobre casos y controversias como el presente, claudica su función revisora, deber ministerial que nos fuera encomendado por la Constitución de Puerto Rico.(96) Nos reiteramos que ello atenta directamente contra el axioma de igualdad que es imprescindible para nuestra sociedad, socavando de esa forma los pilares de nuestro esquema constitucional.
La justicia debe ser inmaculada no sólo en su realidad interior, sino también en su apariencia externa.(97) Sobre *757 este particular es de vital importancia la consistencia en la adjudicación. A pesar de que la coherencia de nuestras nor-mas no constituye una garantía absoluta de la corrección de nuestras decisiones, ser consistentes al adjudicar le im-prime estabilidad, confiabilidad y credibilidad a nuestro sistema de justicia, así como a nuestra democracia constitucional.(98)
En aras de salvaguardar el derecho a la libertad de ex-presión y a la libertad de prensa, debemos siempre tratar de ser consistentes. De otra forma, existe el peligro, en un caso como el presente, que se utilice el poder y la discreción judicial para castigar la expresión que resulta antipática. Es impermisible colocar o tratar de forma diferente a sec-tores de la prensa meramente porque su estilo y editorial se aparte de lo que regularmente los tribunales han clasi-ficado como “prensa tradicional”.(99) Igualmente, en aras de salvaguardar el derecho a la intimidad y al inviolable prin-cipio de la dignidad del ser humano que tiene toda figura pública, el trato que le dispensemos a ésta tiene que responder a las nociones de igualdad y equidad.
VIII
Por todos los fundamentos antes expuestos, respetuosa-mente DISENTIMOS del curso de acción de este Tribunal. Expediríamos el recurso y revocaríamos las Sentencias dic-tadas por el Tribunal de Primera Instancia y el Tribunal de Apelaciones.

 Resulta pertinente resaltar que este Tribunal no consolidó los casos CC-2007-516 y CC-2007-519, a pesar de que ambas controversias se originaron de los mismos hechos.

 El Sr. Adolfo Krans es dueño de dos corporaciones, una dedicada al mercadeo de seguros y la otra es la propietaria del edificio donde ubican las oficinas de la primera. Ninguna de estas corporaciones compareció como parte demandante en el presente caso. Así lo indican las determinaciones de hechos del foro primario. Senten-cia del Tribunal de Primera Instancia, Apéndice del Recurso de certiorari, CC-2007-516, págs. 969-970; Apéndice de la Petición de auto de certiorari, CC-2007-519, págs. 29-30.

 El señor Krans participaba como ponente en el programa radial Fuego Cru-zado y, asimismo, se ha expresado vigorosamente en diversos foros a favor de la unicameralidad, ello antes y después del referéndum que a esos efectos se celebró en el verano de 2005. Sentencia del Tribunal de Primera Instancia, Apéndice del Re-curso de certiorari, CC-2007-516, pág. 974; Apéndice de la Petición de auto de certio-rari, CC-2007-519, pág. 34.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de cer-tiorari, CC-2007-516, pág. 970; Apéndice de la Petición de certiorari, CC-2007-519, pág. 30.

 íd.

 Cabe resaltar que el hijo mayor del señor Krans, el Sr. Kenneth Krans Ne-grón, se encontraba de vacaciones en China al momento de los hechos. No obstante, al referirnos a los hijos del señor Krans, se incluye a éste. Véase Sentencia del Tribunal de Primera Instancia, Apéndice de la Petición de certiorari, CC-2007-516, pág. 971; Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 31.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de cer-tiorari, CC-2007-516, págs. 971-972; Apéndice de la Petición de auto de certiorari, CC-2007-519, págs. 30-31.

 El Sr. Kendall Krans Negrón.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de cer-tiorari, CC-2007-516, pág. 971; Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 31.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Recursó de cer-tiorari, CC-2007-516, págs. 971-972; Apéndice de la Petición de auto de certiorari, CC-2007-519, págs. 31-32.

 Demanda, Apéndice del Recurso de certiorari, CC-2007-516, págs. 1719-1723.

 Véanse, además: Demanda enmendada, de 28 de mayo de 2003, Apéndice del Recurso de certiorari, CC-2007-516, págs. 1494-1499; Segunda demanda enmen-dada, de 3 de mayo de 2004, Apéndice del Recurso de certiorari, CC-2007-516, págs. 1434-1438, y Apéndice de la Petición de auto de certiorari, CC-2007-519, págs. 1-5.

 El señor Krans sostuvo que las actuaciones de los peticionarios afectaron negativamente su relación matrimonial y que contribuyeron a la eventual ruptura de su matrimonio con la Gobernadora. No obstante, el foro primario no avaló dicho argumento. Según las determinaciones de hechos del foro primario, la propia Gober-nadora le indicó al señor Krans que lo transmitido por el programa SuperXclusivo no tuvo relación alguna con su decisión de divorciarse. Además, según indican las deter-minaciones de hechos de dicho foro, la infidelidad nunca se planteó en el trámite de divorcio. Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de certio-rari, CC-2007-516, pág. 971; Apéndice del de la Petición de auto de certiorari, CC-2007-519, pág. 31.

 El juicio se celebró durante los días 5, 8, 9, 19 y 21 de diciembre de 2005.

 Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de cer-tiorari, CC-2007-516, pág. 971, y Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 31.

 El señor Fernández se desempeñaba como reportero del programa SuperX-clusivo y era quien investigaba y reportaba eventos y noticias de la farándula y de otras figuras públicas. Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de certiorari, CC-2007-516, pág. 970, y Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 30.
Además, es pertinente resaltar que el Tribunal de Primera Instancia declaró al señor Fernández como testigo no disponible, razón por la cual se presentó su depo-sición en evidencia mediante estipulación éntre todas las partes. Véase Sentencia del Tribunal de Primera Instancia, Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 32 esc. 1.

 Dicha suma se desglosa de la manera siguiente: (1) $180,000 a favor del señor Krans; (2) $20,000 a favor del Sr. Kendall Krans Negrón; (3) $20,000 a favor del Sr. Kenneth Krans Negrón; (4) $20,000 a favor de la Sra. Karusha Krans Negrón, (5) $20,000 a favor de la Sra. Gretchen Krans Negrón. Véase Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de certiorari, CC-2007-516, pág. 989; *738 Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 49.

 Se presentaron ante el Tribunal de Apelaciones tres recursos de apelación. Televicentro presentó el KLAN2006004 el 12 de abril de 2006. El señor Krans y sus hijos presentaron el KLAN200600482 el 19 de abril de 2006. El señor Santarrosa presentó el KLAN200600512 el 26 de abril de 2006. Los apelantes, desde distintas perspectivas y señalamientos de errores, perseguían la modificación de la Sentencia emitida el 7 de marzo de 2006 por el Tribunal de Primera Instancia, Sala Superior de Bayamón, y modificada el 9 de marzo del mismo año. Por ello el foro apelativo inter-medio decidió consolidar los tres recursos.

 Sentencia del Tribunal de Apelaciones, Apéndice del Recurso de certiorari, CC-2007-516, págs. 62-91; Apéndice de la Petición de auto de certiorari, CC-2007-519, págs. 622-651.

 CC-2007-516.

 CC-2007-519.

 Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 269.

 La Primera Enmienda de la Constitución federal dispone los siguiente: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.”

 Oliveras v. Paniagua Diez, 115 D.P.R. 257, 268 (1984).

 P.P.D. v. Gobernador I, 139 D.P.R. 643, 681 (1995); Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153, 159 (1986); Soto v. Srio. de Justicia, 112 D.P.R. 477, 485 (1982).

 Zequeira Blanco v. El Mundo, Inc., 106 D.P.R. 432, 436 (1977). Véase, además, Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 503-504 (1984) (“[T]he freedom to speak one’s mind is not only an aspect of individual liberty —and thus a good unto itself— but also is essential to the common quest for truth and the vitality of society as a whole”).

 Clavell v. El Vocero de P.R., 115 D.P.R. 685, 691 (1984); Torres Silva v. El Mundo, Inc., 106 D.P.R. 415, 420 (1977).

 Véase Cabrero v. Zayas, 167 D.P.R. 766 (2006), opinión disidente.

 Zequeira Blanco v. El Mundo, Inc., supra, pág. 436. Véase St. Amant v. Thompson, 390 U.S. 727, 732 (1968)(“[T]o insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not”).

 Zequeira Blanco v. El Mundo, Inc., supra, pág. 436, citando a New York Times v. Sullivan, 376 U.S. 254, 270 (1964).

 Oliveras v. Paniagua Diez, supra, pág. 268, citando a B. J. Chamberlain y C. J. Brown, The First Amendment Reconsidered, Nueva York, Ed. Longman, 1982, pág. 110.

 I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed. rev., San Juan, Lexis Publishing, 2000, pág. 74. Véase, además, Vélez v. García, 163 D.P.R. 223, 225-226 (2004), en donde definimos difamación como “ ‘desacreditar a una persona publicando cosas contra su reputación’ (Énfasis suplido.)

 “Se entiende por libelo la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública y trato social, o pequdi-carle en. sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle, o cualquiera difamación maliciosa publicada, como antes se ha dicho, con la intención de denigrar o deprimir la memoria de un muerto y desacreditar o provocar a los parientes y amigos sobrevivientes.” 32 L.P.R.A. sec. 3142.

 “Se entiende por calumnia la publicación falsa o ilegal, que no sea un libelo, y que impute a una persona la comisión de un hecho constitutivo de delito, o tienda directamente a peijudicarle con relación a su oficina, profesión, comercio o negocios, o que, como consecuencia natural, le cause daños reales y efectivos.” 32 L.P.R.A. sec. 3143.

 Ley de 19 de febrero de 1902 (32 L.P.R.A. secs. 3141-3149).

 32 L.P.R.A. sec. 3141 et seq.

 Pérez v. El Vocero de P.R., 149 D.P.R. 427, 441 (1999); Méndez Arocho v. El Vocero de P.R., 130 D.P.R. 867, 876, (1992); Clavell v. El Vocero de P.R., supra, pág. 690; García Cruz v. El Mundo, Inc., 108 D.P.R. 174, 180 (1978); Cortés Portalatín v. Hau Colón, 103 D.P.R. 734, 738 (1975).

 Íd.

 El Art. II, Sec. 8 de la Constitución de Puerto Rico dispone lo siguiente: “Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, reputación y a su vida privada o familiar.” Const. E.L.A., supra, pág. 301.

 Pérez v. El Vocero de P.R., supra, págs. 441-442. Véase, además, D. Biderman y otros, Law and Business of the Entertainment Industries, 4ta ed., Londres, Ed. PRAEGER, 2001, pág. 195 (“Just as the public figures ‘right of privacy must yield to the public interest so too much ‘right of publicity bow were such conflicts with the free dissemination of thoughts, idea, newsworthy events, and matters of public interest”).

 Pueblo v. Santos Vega, 115 D.P.R. 818, 821 (1984); Aponte Martínez v. Lugo, 100 D.P.R. 282, 290 (1971); Mari Bras v. Casañas, 96 D.P.R. 15, 21 (1968).

 Pueblo v. Santos Vega, supra, pág. 821, citando a Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 256 (1979).

 Garib Bazain v. Clavell, 135 D.P.R. 475, 482 (1994); Méndez Arocho v. El Vocero de P.R., supra, págs. 877-878; Villanueva v. Hernández Class, 128 D.P.R. 618, 642-643 (1991); Maldonado y Negrón v. Marrero y Blanco, 121 D.P.R. 705, 715 (1988); Ocasio v. Alcalde Mun. de Maunábo, 121 D.P.R. 37, 61-62 (1988); González Martínez v. López, 118 D.P.R. 190, 192-193 (1987); Soc. de Gananciales v. López, 116 D.P.R. 112, 115 (1985); Oliveras v. Paniagua Diez, supra, pág. 262; García Cruz v. El Mundo, Inc., supra, pág. 178; Torres Silva v. El Mundo, Inc., supra, pág. 421; Zequeira Blanco v. El Mundo, Inc., supra, pág. 435.

 Soc. De Gananciales v. López, supra, pág. 115. Véase, además, García Cruz v. El Mundo, Inc., supra, pág. 178.

 García Cruz v. El Mundo, Inc., supra, pág. 180; Torres Silva v. El Mundo, Inc., supra, pág. 423.

 La figura pública, como cualquier otro promovente, tiene la carga inicial de la prueba para apoyar las defensas alegadas. Véase Pérez v. El Vocero de P.R., supra, pág. 446.

 Clavéll v. El Vocero de P.R., supra, pág. 696; García Cruz v. El Mundo, Inc., supra, pág. 180.

 St. Amant v. Thompson, supra, pág. 730 (“[The Court noted that although] [r]eckless disregard,’... cannot be fully encompassed in one infallible definition!, and that, invariably,] its outer limits [would] be marked out through case-by-case adjudication, [it was nonetheless true that cases prior to St. Amant had provided sufficient guidance to make it clear that St. Amant’s conduct did not constitute recklessness]”).

 Gertz v. Robert Welch, 418 U.S. 323, 344 (1974) (“[T]his approach would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. Because an ad hoc resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application. Such rules necessarily treat alike various cases involving differences as well as similarities. Thus it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority”).

 Véase Bose Corp. v. Consumers Union of U.S., Inc., supra, pág. 503 esc. 21, citando a L. Green, Judge and Jury 286 (1930) (Chapter 10 of this work by Professor Green, 16 Va. L. Rev. 749 (1930)) (“And it must be kept in mind that the judge has another distinct function in dealing with these elements, which though not frequently called into play, is of the utmost importance. It involves the determination of the scope of the general formula, or some one of its elements. It comes into play in the marginal cases. It requires the judge to say what sort of conduct can be considered as condemned under the rules which are employed in such cases. It is the function through which the formulas and rules themselves were evolved, through which their integrity is maintained and their availability determined”, énfasis suprimido).

 En nuestra opinión disidente en Cabrero v. Zayas, supra, pág. 801, nos habíamos expresado sobre este aspecto, al establecer lo siguiente:
*745 “Cierto es que no podemos encerrar el grave menosprecio a la verdad al que se refiere la doctrina en una definición inflexible. Por ello, inevitablemente, la determi-nación de lo que constituye grave menosprecio a la verdad se hará mediante un análisis caso a caso. Ello obedece a una razón sencilla: la determinación de lo que constituye malicia real dependerá de los hechos particulares de cada caso. No obs-tante, ello no es^obstáculo para que podamos darle contenido a dicho estándar constitucional.” (Enfasis suprimido.)

 Villanueva v. Hernández Class, supra, pág. 643; Soc. de Gananciales v. López, supra, pág. 115; García Cruz v. El Mundo, Inc., supra, págs. 180-181.

 Soc. de Gananciales v. López, supra; García Cruz v. El Mundo, Inc., supra.

 Villanueva v. Hernández Class, supra, págs. 644-645. Véanse, además: Garib Bazain v. Clavell, supra, pág. 485; Oliveras v. Paniagua Diez, supra, pág. 270; García Cruz v. El Mundo, Inc., supra, pág. 183.

 García Cruz v. El Mundo, Inc., supra, pág. 181. Véanse, además: Henry v. Collins, 380 U.S. 356 (1965); Rosenblatt v. Baer, 383 U.S. 75 (1966); W.L. Eckhardt, Jr. y A.D. McKey, Caldero v. Tribune Publishing Co.: Substantive and Remedial Aspects of First Amendment Protection for a Reporter’s Confidential Sources, 14 Idaho L. Rev. 21 (1977).

 Tavoulareas v. Piro, 817 F.2d 762, 776 (D.C. Cir. 1987).

 P.P.D. v. Admor. Gen. de Elecciones, 111 DPR 199, 224 (1981).

 Gertz v. Robert Welch, Inc., supra, pág. 342 (“administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability”).

 Méndez Arocho v. El Vocero de P.R., supra, pág. 880.

 P.P.D v Admor. Gen. de Elecciones, supra, pág. 223.

 McFarlane v. Sheridian Square Press Inc., 91 F.3d 1501, 1515 (D.C. Cir. 1996), citando a St. Amant v. Thompson, supra, pág. 731 (“Few public figures have been able clearly and convincingly to prove that the scurrilous things said about them were published by someone with ‘serious doubts as to the truth of his publication’ ”).

 32 L.P.R.A. Ap. IV.

 Ei inciSo (H) de la Regla 10 de Evidencia de Puerto Rico dispone lo siguiente:
“Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Se en- *747 tiende por evidencia directa aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna, y que de ser cierta demuestra el hecho de modo concluyente. Se entiende por evidencia indirecta o circuns-tancial aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos— puede razonablemente inferirse el hecho én controversia.” 32 L.P.R.A. Ap. IV.

 Pueblo v. Ortiz Rodríguez, 100 D.P.R. 972, 978 (1972).

 Pueblo v. Rivera Rivera, 117 D.P.R. 283, 294 (1986); Pueblo v. Salgado Velázquez, 93 D.P.R. 380, 383 (1966).

 Pueblo v. Picó Vidal, 99 D.P.R. 708 (1971).

 R. Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, 2da ed., San Juan, Eds. SITUM, 2005, pág. 165.

 Íd.

 Íd.

 Íd., citando la Regla 13 de Evidencia vigente, 32 L.P.R.A. Ap. IV.

 Pueblo v. Cortés del Castillo, 86 D.P.R. 220 (1962).

 Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 668 (1989) (“[A] plaintiff is entitled to prove the defendant’s state of mind through circumstantial evidence ... and it cannot be said that the evidence concerning motive or care never bears any relation to the actual malice inquiry”). Véase, además, Herbert v. Lando, 441 U.S. 153, 160 (1979).

 St. Amant v. Thompson, supra, pág. 731 (“These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice”).

 Véase, además, OAO Alfa Bank v. Center for Public Integrity, 387 F.Supp.2d 20, 50 (D.C. C. 2005) (“To prevent the inquiry into the defendant’s subjective state of mind from slipping into an open-ended review of the reasonableness of the defendant’s investigation or his compliance with the professional standards ...”).

 St. Amant v. Thompson, supra, pág. 732 (“The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher’s allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports”).

 Pueblo v. Miranda Ortiz, 117 D.P.R. 188, 191 (1986).

 Emmanuelli Jiménez, op. eit, pág. 156, citando a Pueblo v. Rodríguez Román, 128 D.P.R. 121 (1991); Cárdenas Maxán v. Rodríguez, 125 D.P.R. 702 (1990); Zambrana v. Hospital Santo Asilo de Damas, 109 D.P.R. 517 (1980).

 Méndez v. Morales, 142 D.P.R. 26, 36 (1996); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987).

 Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977), citando a Maryland Casualty Co. v. Quick Const. Corp., 90 D.P.R. 329, 336 (1964).

 Bose Corp. v. Consumers Union of U.S., Inc., supra, págs. 509-510, citando a Time, Inc. v. Pape, 401 U.S. 279, 284 (1971) (“ ‘[In] cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions sure founded,’ noting that ‘in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review “the evidence in the ... record to determine whether it could constitutionally support a judgment” for the plaintiff’ ”).

 Bose Corp. v. Consumers Union of U.S., Inc., supra, pág. 499, citando a New York Times Co. v. Sullivan, supra, págs. 284-286; NAACP v. Claiborne Hardware Co., 458 U.S. 886, 933-934 (1982); Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 11 (1970); St. Amant v. Thompson, supra, págs. 732-733 (“[fin cases raising First Amendment issues we have repeatedly held that an appellate court has an obligation to ‘make an independent examination of the whole record’ in order to make sure that ‘the judgment does not constitute a forbidden intrusion on the field of free expression’ ”).

 El profesor Rolando Emmanuelli Jiménez expresa, en lo pertiente, lo si-guiente: “... \P\uede ocurrir que una parte cumpla con su obligación de presentar evidencia sobre las controversias esenciales del caso, pero ésta evidencia no puede dar base a una sentencia a su favor porque no satisfizo el criterio particular de persuasión del juzgador que sea aplicable al caso.” Emmanuelli Jiménez, op. cit., pág. 150.

 Véase Admor. F.S.E. v. Almacén Ramón Rosa, 151 D.P.R. 711, 724-725 (2000).

 Véase Deposición del señor Leopoldo Fernández III, Apéndice del Recurso de certiorari, CC-2007-516, pág. 1188.

 Íd., pág. 1196.

 El tratadista Rodney A. Smolla, citando a Bose Corp. v. Consumer Union of U.S., Inc., supra, expresa, en lo pertinente, lo siguiente: “[T]he Supreme Court, in reaffirming the principle of independent appellate review of the actual malice determination, again emphasized the subjective nature of the inquiry, noting that the actual malice issue before it ‘rests entirely on an evaluation of the [author’s] state of mind when he wrote his initial report, or when he checked the article against that report’.” (Corchetes en el original.) 2 Smolla and Nimmer on Freedom of Speech Sec. 23:3, pág. 23-14 (2006).

 En Harris v. City of Seattle, 152 Fed. Appx. 565 (9no Cir. 2005), el Tribunal de Apelaciones para el Noveno Circuito resolvió que las meras alegaciones de un demandante, a los efectos de que negó la veracidad de la información divulgada, no establecen de por sí que el reportero actuó con grave menosprecio a la verdad.

 Véase Smolla and Nimmer, supra, Sec. 23:3, págs. 23-16 y 23-17 (“A person who is the subject of a story being investigated will often strongly deny the defamatory charges, either personally or through a lawyer or other representative. Such a denial may or may not impact on the actual malice calculus, depending on the circumstances. If the denial is of a kind that would plausibly induce subjective doubt, then the denial may be a factor that can be used to construct a case for the existence of actual malice, for once a publisher has reasons to doubt the accuracy of a story, the publisher must act reasonably to dispel those doubts prior to publishing. However, a reporter need not believe self-serving denials, as ‘such denials are so commonplace in the world of polemical charge and countercharge.’ A denial only serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality”).

 gi foro primario, en su determinación de hechos número cinco, estimó pro-bado lo siguiente:
“El señor Santarrosa es titiritero. A través de su personaje, “La Comay”, divulga información, entre otras, de figuras públicas del país. Normalmente esta información proviene de llamadas telefónicas del público a través de líneas telefónicas que él tiene disponibles para ese fin.” Sentencia del Tribunal de Primera Instancia, Apéndice del Recurso de certiorari, CC-2007-516, pág. 970, y Apéndice de la Petición de auto de certiorari, CC-2007-519, pág. 30. Con esto el foro primario parece sugerir que toda la información publicada en el programa SuperXclusivo carece de confiabilidad y corrección por obtenerse a través de llamadas telefónicas anónimas.

 Véase McFarlane v. Sheridian Square Press Inc., supra, pág. 1510; Clyburn v. News World Communications, Inc., 705 F.Supp. 635, 641-642 (D. D.C. 1989) (“DD]efendant’s reliance on the confidential sources, who, in turn, relied on informants, does not indicate actual malice”).

 McFarlane v. Sheridian Square Press, Inc., supra, pág. 1512.

 Véase Deposición del señor Leopoldo Fernández III, Apéndice del Recurso de certiorari, CC-2007-516, págs. 1171-1172.

 P.P.D. v. Gobernador I, supra, pág. 680, citando a Noriega v. Gobernador, 130 D.P.R. 919 (1992); Noriega v. Gobernador, 122 D.P.R. 650 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987); Soto v. Srio. de Justicia, supra, pág. 485; Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960); Sierra v. Tribunal Superior, 81 D.P.R. 554 (1959).

 Véase P.P.D. v. Gobernador II, 136 D.P.R. 916, 923-924 (1994).

 En Cabrero v. Zayas, supra, la Mayoría de este Tribunal desestimó suma-riamente una demanda de libelo que instó un ex funcionario público contra el perió-dico El Nuevo Día por estimar que éste no contaba con prueba para establecer los requisitos constitucionales de su acción. En aquel caso el demandante, el señor Antonio Cabrero Muñiz, quien se desempeñaba al momento de los hechos como Síndico Especial de la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda, contaba con evidencia directa que sostenía sus ale-gaciones en cuanto a que las expresiones del periódico eran falsas y que fueron divulgadas con grave menosprecio a la verdad. Demostró, además, que ofreció evi-dencia a la reportera sobre el asunto divulgado por ella públicamente con el propó-sito de que corrigiese sus expresiones previas.
*756 No obstante, este Tribunal resolvió que el señor Antonio Cabrero Muñiz no aportó evidencia clara y convincente cuya posible credibilidad justificara una de-terminación de que el periódico El Nuevo Día en su publicación hizo expresiones difamatorias, falsas y con malicia real. En síntesis, este Tribunal determinó que la intención de grave menosprecio a la verdad o conocimiento de la verdad no podía inferirse razonablemente de una investigación periodística defectuosa, aún con el conocimiento por la periodista de la existencia de una evidencia que decidió no examinar y que alegadamente apuntaba en dirección contraria.
En el caso antes reseñado, a diferencia del caso de autos, el demandante con-taba con evidencia directa para probar, en la etapa de sentencia sumaria, la exis-tencia de una controversia esencial sobre la presencia de malicia real en la publicación. No obstante, la Mayoría de este Tribunal determinó que esa evidencia era insuficiente para dicho fin. Por el contrario, en el caso de autos, donde la única evidencia con la cual contaban los demandantes —señor Krans y sus hijos— para probar la existencia de malicia real en la publicación es indirecta o circunstancial, a saber, la inexistencia del video, la Mayoría estimó que ésta era suficiente para hacer una inferencia razonable sobre la intención de grave menosprecio a la verdad o conocimiento de la verdad al momento de la publicación.

 En este punto nos parece pertinente ilustrar el tema con una cita de Bose Corp. v. Consumers Union of U.S., Inc., supra, págs. 510-511. En dicho caso el Tribunal Supremo federal, por conducto del Juez Stevens, resolvió lo siguiente:
“The requirement of independent appellate review reiterated in New York Times Co. v. Sullivan is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges —and particularly Members of this Court— must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of ‘actual malice.’ ”

 P.N.P. v. Gobernadora, 162 D.P.R. 239, 314 (2004), opinión disidente, citando a In re Rodriguez Torres, 104 D.P.R. 758, 766 (1976).

 pjyjs a Gobernadora, supra, opinión disidente.

 Véase Anderson v. Cryovac, Inc., 805 F.2d 1, 9 (1er Cir. 1986) (“The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the [F]irst [A]mendment”); Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 578 (1977) (“There is no doubt that entertainment, as well as news, enjoys First Amendment protection. It is also true that entertainment itself can be important news”).